# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ALEX VAN DER ZWAAN,

                Defendant.

Criminal No.: 18-CR-31 (ABJ)

## SENTENCING MEMORANDUM
## ON BEHALF OF ALEX VAN DER ZWAAN

COOLEY LLP
William J. Schwartz (*pro hac vice*)
Laura Grossfield Birger (*pro hac vice*)
Nicholas Flath (*pro hac vice*)
1114 Avenue of the Americas
New York, New York  10036
Phone: (212) 479-6000
Fax:  (212) 479-6275

*Counsel for Alex van der Zwaan*

Dated: March 27, 2018

## INTRODUCTION

Alex van der Zwaan is a loving husband, expectant father, devoted son, and caring friend and godparent.  A few months ago, he was a successful attorney with bright career prospects. Now, his world has collapsed as a result of his decision to lie to law enforcement.  His career has been destroyed, he has been separated from his friends and family, and he faces the possibility of missing the birth of his first child.  Although Alex committed a serious offense, just punishment does not require incarceration.  Having been explicitly warned by the prosecutors during the interview that he could be prosecuted in the United States for making false statements, Alex decided to return here less than two weeks after that interview in order to correct the record and answer the government's questions about his false statements and other topics.  Further, Alex made a concerted effort to correct the record.  Prior to returning to the United States, Alex produced notes and recordings of the conversations about which he had been asked, providing the government with the best proof that his statements were false.  Having agreed shortly after his arrival to surrender his passport to the government, Alex has remained in limbo in the United States for more than four months awaiting resolution of this matter.  The Sentencing Guidelines range is 0-6 months, so a non-jail sentence is within the applicable range. We urge the Court to sentence Alex van der Zwaan to a non-custodial sentence, and permit him to return to London to be with his wife and family.

## PERSONAL BACKGROUND

Alex is 33 years old.  He was born in Brussels, Belgium, and is a citizen of the Netherlands.  He has lived in Europe his entire life.  Alex is an only child, and he has been exceptionally close to his mother since childhood.  As Ludmilla Oleolenko van der Zwaan, Alex's mother, writes:

> Alex's father and myself were 46 and 33 respectively when we had him.  He was the first child for both of us, and in those days, 33 was an old age to have your first.  I devoted myself entirely to Alex's upbringing and education. Throughout his childhood, he never spent an hour with a baby sitter or a nanny. . . . Alex and I have always been very close.  His father was often away on business trips, so Alex and I spent all our time together.[1]

The relationship between Alex and his mother was strengthened through their use of a shared language.  As Ms. van der Zwaan explains, she was born and raised in the Soviet Union and emigrated to the West when she was in her mid-twenties.  Her ex-husband, Alex's father, is Dutch, and she had few opportunities to speak or hear her native language.  She spoke Russian with Alex from birth.  She states, "[W]e always spoke Russian between the two of us.  In those days, there was no Russian television and nobody beside myself spoke Russian, so it allowed us to create a special bond, a secret language, which only the two of us understood."[2]

Alex grew up in a middle class home and attended international schools in Brussels.  He studied law at King's College in London,[3] where he served as President of the King's College Law Students' Society and graduated with distinction.[4]  While he was studying for his law degree, Alex received a job offer from Skadden, Arps, Slate, Meagher & Flom, a major international law firm.  He joined Skadden's London office following the completion of his legal studies, and he worked there for the next ten years, until he was fired by the firm in late November 2017.

Alex worked hard during his tenure at Skadden; he was well regarded and advanced steadily at the firm.[5]  His international upbringing and varied language skills (he speaks fluent

---

[1]  Letter of Ludmilla Oleoenko van der Zwaan, attached hereto as Exhibit 1.

[2]  *Id.*

[3]  In the United Kingdom, students study law as part of their university education rather than post-graduate as in the United States.

[4]  Letter of Rolf van der Zwaan (Ex. 2).

[5]  *Id.*; Letter of Mark Crofskey (Ex. 3).

French as well as Russian and English, and he is conversant in Dutch) served him well professionally; he travelled often and worked for a variety of sophisticated, international clients.[6] Alex's first supervisor at Skadden became a close friend, and chose Alex as the godfather of his eldest son, seeing in him the potential to serve as a role model and a positive influence on his child.[7]

In 2016, Alex met Eva Khan, who quickly became the love of his life. Eva was born in Russia (and is a citizen of that country and Israel). She was studying art in London when the two met. As Eva writes, she and Alex "instantly clicked and fell in love."[8] About a year later, they married. Despite the fact that Eva comes from a wealthy background, they live in the modest London apartment that Alex purchased with his salary at Skadden and a mortgage, and Alex provided for the two of them. At the time of his offense, approximately five months after their wedding, they were just embarking on building their joint life together. Indeed, even as the events involved in this prosecution were unfolding, Eva and Alex received happy news: Eva will give birth to their first child—a son—in August.

## OFFENSE CONDUCT

### A.    The November 3, 2017 Interview with the Government

This case arises from a matter on which Alex was assigned to work approximately six years ago. In 2012, Skadden was retained to prepare a report for the Ukraine Ministry of Justice concerning the criminal trial of Yulia Tymoshenko, the former Prime Minister of the Ukraine. Alex was a relatively junior associate at the time, and his primary role on the matter was to facilitate communication between the firm and its clients. In that role, he worked closely with

---

[6]  The firm offered him and he accepted responsibility exceeding his class seniority.

[7]  Letter of Mark Crofskey (Ex. 3).

[8]  Letter of Eva Khan (Ex. 4).

Rick Gates and an individual identified as Person A in the Information and Statement of the Offense. Years later, Skadden's work in connection with the Tymoshenko report and, in particular, its contacts with Paul Manafort and Rick Gates apparently became of interest to the Office of the Special Counsel ("OSC"). On November 3, 2017, pursuant to a request by the OSC communicated through Skadden, Alex voluntarily participated in an interview with OSC prosecutors and Special Agents of the Federal Bureau of Investigation. Alex travelled from London to Washington, D.C. for the interview, which lasted more than eight hours and covered a variety of topics related to his work on the Tymoshenko report. Alex was represented by Skadden lawyers.

Although Alex understood both the importance of being truthful to the OSC and the legal significance of not being truthful, he lied in answering certain questions. As he admitted during his guilty plea, Alex falsely stated that his last communication with Rick Gates was an innocuous text message in mid-August 2016 and that his last communication with Person A occurred in 2014, when he knew he had spoken with (and indeed had recorded) both in September 2016. In addition, when confronted with an email from his Skadden account that alluded to the September 2016 communications, Alex falsely stated that he did not know why Skadden had not produced that email to the OSC; in fact, Alex knew that he had not identified that email to Skadden in response to its request for relevant materials.[9]

---

[9] In describing that email, Paragraph 6(b) of the Statement of the Offense states that Person A wrote a Russian email to Alex asking him to communicate on an "encrypted application." Alex typically communicated with Person A, a native Russian speaker, in Russian. They also typically communicated on commonly-used apps such as WhatsApp, Viber, and Telegram, which provide for free calls and messages and happen to be encrypted. The message at issue simply asked Alex to contact Person A on WhatsApp or Telegram. There was nothing unusual about the language or medium used in this communication.

The circumstances under which Alex committed his offense and his subsequent effort to correct the record do not excuse his conduct, but they provide useful context, which we respectfully submit is relevant to sentencing.  In September 2016, long after Skadden's work on the Tymoshenko report had been completed, Alex was contacted by Rick Gates, who urged him to contact Person A.  Gates also sent Alex a legal document in Ukranian, a language Alex cannot read.  Alex then spoke with Person A, who told Alex that the new Ukranian regime might file formal criminal charges against various individuals, including Alex and other Skadden personnel, related to Skadden's work on the Tymoshenko report.  Alex immediately reported these communications to the Skadden senior partner with whom he had worked on the Tymoshenko report.  After speaking with Person A and the Skadden partner, Alex also discussed the Ukranian investigation with Gates.  Following his receipt of the Ukranian document, and in light of the unusual and unnerving nature of these communications, Alex used a dictaphone to surreptitiously record his calls with Person A and Gates so that he would have a record of the discussions.  Further, Alex was concerned that Skadden might not focus on the matter unfolding in the Ukraine, which he considered alarming.  So, unbeknownst to the Skadden partner, who assured him during the call that Skadden was aware of and dealing with the matter, Alex turned on the dictaphone in the course of receiving assurance that Skadden was handling the issue.

Prior to his November 3, 2017 meeting with the OSC, Alex had not told anyone about the existence of the recordings or the handwritten notes he had made of the calls. When Alex was asked in the interview by the OSC about his most recent conversations with Gates and Person A, he found himself in a difficult situation.  He knew that it was improper to have recorded his conversation with the Skadden senior partner; indeed, he understood that he could be fired for having done so.  He also knew that a truthful disclosure about his September 2016 calls with

Gates and Person A would almost inevitably lead to questioning that could quickly get to the existence of the recordings.  During the interview, Alex was keenly aware that he was not speaking only to the OSC.  Alex was represented by Skadden lawyers, and anything he shared with the OSC would simultaneously be heard by Skadden.  In his mind, his boss was listening to every word.

Focused on preserving his career at Skadden, and fearful that truthful answers could lead to discovery of the recordings (and in particular, the discovery that he had recorded a Skadden partner), Alex made a terrible decision:  he decided to cut off the inquiry at its inception by lying about the September 2016 conversations with Gates and Person A.  He falsely stated that his last communications with those individuals had occurred earlier and had been non-substantive. When Alex was shown a September 2016 email from his Skadden account in which Person A suggested that Alex contact him, Alex lied again and stated that he did not know why it had not been produced; in fact, Alex was aware that he had not carefully reviewed and flagged for Skadden all of his emails from the period after he ceased working on the Tymoshenko matter.[10]

Alex also failed to flag some personal emails from his Skadden account and he deleted some emails from his personal g-mail account after Skadden sought access to that account.  Alex was concerned about social communications with various individuals on his Skadden emails. Further, in approximately 2012 and 2013, Alex had explored opportunities to leave Skadden to work directly for Gates and Manafort, and he corresponded with them about that possibility on g-mail. Again, Alex did not want his employer to see these emails.  As a result, he did not flag all the responsive emails from his Skadden account, and he deleted some emails about his

---

[10]  Paragraph 7 of the Statement of the Offense also sets forth Alex's statement during the November 3 interview that he "played a passive role" in the rollout of the Tymoshenko report. Alex's plea does not encompass this statement, which he did not consider to be false or misleading when made.

prospective employment with Gates and Manafort from his g-mail account online, before

providing access to that account to Skadden.[11]   Alex's motivation was not to hinder this

investigation, but to prevent Skadden from learning about activities he thought could be

detrimental to his career.

**B.     Alex's Efforts to Correct the Record after November 3**

Alex had made serious mistakes, and he knew it.  Even though he was still represented by

Skadden, Alex decided to correct the record.  Aware that his false statements could lead to his

prosecution in the United States, Alex nonetheless decided to return to this country to meet again

with the OSC to correct the record and to answer further questions.  Prior to returning to the

United States, he disclosed the existence of, and turned over, notes and recordings of the

conversations he had in September 2016.  By turning over the notes and the recordings, Alex

provided the OSC with powerful evidence that irrefutably proved that he had made false

statements and which he knew could be used to prosecute him for those statements.  It is our

understanding that the OSC did not know about the recordings until Alex revealed their

existence.

Alex arrived in New York on November 16, 2017, just thirteen days after his initial

interview, and began to prepare for a second meeting with the OSC that was then scheduled to

occur early the following week.  The day after his arrival, the OSC asked Alex to surrender his

passport to the FBI.  He agreed to do so, retained new counsel after discussing the matter with

Skadden, and continued to provide information to the OSC.

---

[11]  To our knowledge, the OSC was unaware of Alex's deletion of emails before he disclosed it.
Significantly, shortly after deleting emails from his g-mail account, and before the November 3
interview, Alex gave Skadden the personal laptop that he had used at the time those emails were
created, because he believed the deleted emails remained on that device.

On December 1, 2017, Alex participated in a second voluntary interview with the OSC. At this interview, which lasted many hours, Alex admitted his false statements and answered questions about them, the recorded conversations, and several other subjects.

In his effort to correct the record, Alex also provided numerous electronic devices to Skadden to be produced to the OSC.  These included his work and personal cell phones (including old cell phones that were no longer in use), an iPad, and his laptops.  In addition, he tried to facilitate access to those devices, by providing the passwords he remembered (and offering his fingerprint for the devices that used that security method) and, at the OSC's request, giving permission to Apple to attempt to recover information from a damaged iPhone.

The conduct that brings Alex before this Court was inexcusable.  And while his actions following his initial meeting with the OSC cannot absolve him from culpability, they are compelling mitigating factors in considering punishment.  Further, as discussed below, his decision to turn over the recordings and to return to the United States to admit his false statements has come at great cost.  We respectfully submit that his remedial actions are important factors for this Court in fashioning an appropriate sentence.

## THE 3553(a) FACTORS FAVOR A NON-JAIL SENTENCE

Title 18, United States Code, Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in the statute.

In this case, the nature and circumstances of the offense, the history and characteristics of the defendant, and the applicable Guidelines range all weigh heavily in favor of a non-custodial sentence.  *See* 18 U.S.C. § 3553(a)(1), (4).  Alex has acknowledged his wrongful conduct and fully accepted responsibility.  He has done everything he can do to remedy his false statements, and the false statements have had no lasting effect on the investigation.  The Sentencing

Guidelines provide for an extremely low offense level of 4 and a sentencing range of 0-6 months, placing a non-custodial sentence squarely within the applicable range.  In light of his post-offense behavior and his unusual personal circumstances, a non-custodial sentence is sufficient to achieve the purposes of sentencing set forth in § 3553(a).

Moreover, the need for just punishment does not warrant incarceration in this case.  *See* 18 U.S.C. § 3553(a)(2)(A).  Alex has already suffered severe consequences from his offense.  He returned to the United States and submitted to the OSC's jurisdiction to correct the record in mid-November 2017, less than two weeks after his initial interview.  Shortly after his arrival, at OSC's request, Alex surrendered his passport to the Federal Bureau of Investigation.  Subsequently, Alex met again with the OSC, admitted his false statements, answered further questions, and consented to searches of his electronic devices.  Ever since returning in mid-November, Alex has been unable to leave the United States.[12]

The impact of being stranded here has been enormous:  Alex's entire life is overseas; he has no home, no family, and no way to earn a living in this country.  Although he has had occasional visitors and took a car trip with his wife over the Christmas holiday, his existence has been largely solitary.  He lives alone in a hotel in a city where he has no close friends.  His days are empty and lonely.

Moreover, in December, during Eva's Christmas visit, Alex learned that she was pregnant.  ███████████████████████████████████████████████████ ███████████████████████████████████████████ Enduring this prolonged separation, particularly during the pregnancy, has been extremely arduous for Eva.  She writes:

---

[12]  Although we had ongoing discussions with the OSC regarding terms on which Alex would be permitted to return to London pending this investigation and prosecution, including posting security and committing that he would return to the United States when requested, we were unable to reach agreement.

It sounds silly but the flat in which we lived in is empty, and I often sit in it alone, looking at our photos in frames on the counter with a slight disbelief that only months ago we shared such joy and happiness.  I am deprived of his touch and affection, his reassuring voice and strong shoulder to lean on in my times of trouble.  Furthermore, with no one to speak to, I have horrible thoughts entering my head, in a time, which has to be happy for every woman.[13]



To put it bluntly, Eva needs Alex at home, and Alex knows it; every day that Alex spends here alone, he is painfully aware that Eva is suffering without him.

Alex's mother also suffers in his absence.



Alex is her only child.  She has been divorced from Alex's father for almost 15 years, and lives alone, Although Alex lives a few hours away by train, he provides much needed

---

[13]  Letter of Eva Khan (Ex. 4).

[14]  *Id.*

[15]

[16]

physical and financial support.  He runs errands, performs household tasks, and most

importantly, provides emotional support and companionship for his ████████████ mother.

For the first time in their lifelong close relationship, she found herself alone this past Christmas,

because Alex was unable to be with her.[17]  As she describes:

> ALEX IS THE ONLY SUPPORT AND JOY OF MY LIFE - a very good son,
> loving, very kind-hearted and attentive, who is always there when I need him, be
> it financially or emotionally. . . . ██████████████, I do not have much of
> a social life or leave my home often, ████████████
> ████   Even though he lives in another city and travels a lot for business, Alex
> usually visits me at least once every three to four weeks.  His visits are of
> paramount importance to my life and my well-being. [18]

████████████████████████████████████████████████ she

has not seen him in five months.[19]

In addition to the havoc Alex's actions have wreaked on his personal relationships, his

professional life has been destroyed.  After his return to the United States, Skadden terminated

his employment, which is both financially and professionally devastating to Alex.  Alex worked

at Skadden from the time he finished his education; he was proud of everything he had achieved

there, and was hopeful that he would be promoted from associate to counsel in May 2018.

Instead, his career at Skadden is over.  As Mark Crofskey, a former Skadden colleague and

longtime friend, explains:

> Alex worked very hard for [Skadden] and built up an excellent reputation and
> made a substantial contribution.  Alex completely understands that through his
> own actions, the career that he built has turned to dust, he keenly feels the loss of
> this hard won career, as well as the loss of his many colleagues and clients.[20]

---

[17]  Letter of Ludmilla Oleoenko van der Zwaan (Ex. 1).

[18]  *Id.*

[19]  *Id.*

[20]  Letter of Mark Crofskey (Ex. 3).

Moreover, Alex's guilty plea almost certainly assures that his legal career is over. Alex is licensed as a solicitor in England and Wales. Under the rules governing solicitors, it is highly likely that his license will be revoked in the wake of this conviction.[21]   The loss of his career is not only a devastating professional blow to Alex; it undermines his ability to provide for his family. Supporting himself and Eva and providing financial support to his mother have been a matter of great pride to Alex. Since November, he has been without any source of income.[22] Going forward his ability to get a new job and resume financial self-sufficiency when he returns to London is impaired and uncertain.[23]

A sentence of incarceration is not necessary in this case to provide adequate punishment or to reflect the seriousness of the offense. Although he has not been incarcerated, Alex has in many ways been serving a sentence while stuck in limbo since mid-November. He has been alone, separated from his wife; he has lost his job and his career; and he has to live with the knowledge that his suffering and that of his family is due to his own actions. Nor is imprisonment needed to afford adequate deterrence or to protect the public. *See* 18 U.S.C. § 3553(a)(2)(B), (C). Alex has learned his lesson, and there is no risk that he will reoffend. And this widely-publicized prosecution, as well as its collateral consequences, sends a strong message to anyone who considers lying to federal investigators.

---

[21]   The Solicitors Regulation Authority governs the issuance and maintenance of solicitors' licenses in England and Wales. The offense to which Alex pleaded guilty is a felony and one involving dishonesty. SRA guidelines require that such an offense be reported to the SRA, and that body will determine the appropriate disciplinary action. The conduct underlying this offense violates several of the "SRA Principles," including upholding the rule of law and proper administration of justice, acting with integrity, and behaving in a way that maintains the trust the public places in solicitors.

[22]   During this period without current income, Alex has incurred living expenses in the United States while continuing to incur many of his regular expenses in London.

[23]   Letter of Rolf van der Zwaan (Ex. 2); Letter of Mark Crofskey (Ex. 3).

Moreover, any term of imprisonment would be unduly severe under these circumstances. Alex is desperate to return home to Eva as soon as possible, so that he may be with her and can help her both physically and emotionally for the second half of her pregnancy, as well as be present for the birth of his son in August.[24]   Even if the Court were to impose a relatively brief term of imprisonment, Alex's immigration status would likely delay his departure from the United States far beyond the duration of any prison sentence.  It is the policy of Immigration and Customs Enforcement to place a detainer on incarcerated foreign nationals so that any term of imprisonment imposed on Alex would end with his transfer to an immigration detention facility, where he might languish for weeks or even months until he could leave the country.  We urge this Court to avoid embroiling Alex in that process.

A non-custodial sentence combined with an appropriate fine would serve the interests of justice and be consistent with the principles of sentencing.[25]

## CONCLUSION

We respectfully request that the Court impose a sentence of zero months' imprisonment and a fine within the Guidelines range.

---

[24]  Eva has a pending application for permanent residency in the United Kingdom based on her status as Alex's spouse.  The fact of this prosecution, and particularly Alex's prolonged absence from the United Kingdom, have complicated Eva's application.  According to Eva's immigration attorneys, Alex's prompt return to the United Kingdom would greatly increase the probability of success for Eva's application, and reduce the likelihood that she will need to leave the country during her pregnancy.

[25]  When, as in this case, the Guidelines do not require a term of imprisonment, a fine may be the sole sanction.  U.S.S.G. § 5E1.2, n.1.

Respectfully submitted,

COOLEY LLP

By:    /s William J. Schwartz          
        William J. Schwartz (*pro hac vice*)
        Laura Grossfield Birger (*pro hac vice*)
        Nicholas Flath (*pro hac vice*)

1114 Avenue of the Americas
New York, New York 10036
Phone:  (212) 479-6000
Fax:  (212) 479-6275

*Counsel for Defendant Alex van der Zwaan*

# EXHIBIT 1

Honorable Amy Berman Jackson
United States District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson:

I am Ludmilla Oleolenko, Alex van der Zwaan's mother.

I was born and educated in the Soviet Union as a foreign language teacher. I moved to the West in 1976, and have lived in Brussels, Belgium since the early 1980s. Alex's father Rolf van der Zwaan and me are divorced since 12/12/2003. I am retired and have a small pension.

Alex's father and myself were 46 and 33 respectively when we had him. He was the first child for both of us, and in those days, 33 was an old age to have your first. I devoted myself entirely to Alex's upbringing and education. Throughout his childhood, he never spent an hour with a baby sitter or a nanny. I taught him to speak Russian, and we always spoke Russian between the two of us. In those days, there was no Russian television and nobody beside myself spoke Russian, so it allowed us to create a special bond, a secret language, which only the two of us understood. Thanks to these efforts, he has a perfect command of Russian even though he has never lived in Russia or spent any considerable amount of time there.

Alex and I have always been very close. His father was often away on business trips, so Alex and I spent all our time together. He was always a successful and diligent student, and spent a lot of time on sports.

ALEX IS THE ONLY SUPPORT AND JOY OF MY LIFE - a very good son, loving, very kind-hearted and attentive, who is always there when I need him, be it financially or emotionally.

I do not have much of a social life or leave my home often,
Even though he lives in another city and travels a lot for business, Alex usually visits me at least once every three to four weeks. His visits are of paramount importance to my life and my well-being.

When he comes to Brussels, he goes to great pains to stock the house with the things I would have to buy                         He is also a huge emotional support for me. He provides me with comfort and company. I am so happy that I taught him to speak Russian, my native tongue, because I find that as I get older my command of foreign languages is worsening and it is a real joy to be able to speak with him in Russian. Alex also helps me financially, which is important since I do not work and have limited income.

I have missed Alex so much over the last few months. This was my first Christmas without Alex because he always makes a point of being with me for the holiday. Because Alex was not able to visit me, I was alone at Christmas, New Year and my 67th birthday.                         I truly hope that he will be able to come home and I shall have a chance to hold my dearest son in my arms again soon.

Yours faithfully,

*L. Van der Zwaan*

Ludmilla Oleolenko van der Zwaan

# EXHIBIT 2

March 16, 2018

Honorable Amy Berman Jackson
United States District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,

I am Alex's father. I am a Dutch citizen, educated in Sweden, Brazil and Canada. I graduated from the University of Toronto with a degree in mechanical engineering. I worked in the power plant equipment industry for my entire career, and spent the last 32 years in various management positions in Europe with the Solar Turbines division of Caterpillar. I am now retired and living in Belgium, where Alex was born 33 years ago.

Alex was brought up in an international, middle class environment, did well at school and never caused us serious concern. He went on to law school at King's College, London, was elected President of the King's College Law Students' Society, and graduated with distinction.

Alex was given a job offer by Skadden Arps in his second year of university and joined them immediately upon graduation. He worked hard and advanced within the firm. He was assigned by Skadden to various tasks in Ukraine, which he performed to their satisfaction as evidenced by being slated for promotion to Counsel in May 2018. Last year Alex also went ahead to found a family and married Eva Khan, who is now expecting a baby boy.

Late last year, Alex's life changed dramatically. As a result of his actions, Alex's career has been shattered and his family life put in jeopardy. Since November 2017, he has remained in the United States. He has been living alone in hotels under deep uncertainty about his future, facing the tragic possibility of incarceration.

I have visited Alex twice during the last few months. I have observed firsthand how devastating this situation has been for him. Alex devoted himself heart and soul to his job at Skadden, enjoyed what he was doing, and earned the recognition and appreciation which led to his long employment by the firm. The job was not only a source of professional fulfillment, but it permitted him to support himself and his family, something of which he was quite proud. Now, his legal career which had such a good start and bright future appears finished. Finding a new activity and starting from scratch at his age will be difficult.

Furthermore Alex's family life is also severely threatened by the forced separation from his young wife, who is now enduring a difficult pregnancy without the presence of her husband. I know that not being able to help her through this difficult period and the possibility of his not being by her side at the birth of their son is extremely distressing for both Alex and Eva.

Alex has already been severely penalized. I am seriously worried about his future as his morale

and self-confidence have suffered a serious setback.  I trust this will be taken into consideration and am confident that he will be treated fairly.

Thank you for your attention to this letter.

Rolf van der Zwaan

# EXHIBIT 3

*Mark Crofskey*

██████████████████

*London,* ███████████
*United Kingdom*

Honorable Amy Berman Jackson                          5. March 2018
United States District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001
United States of America

Dear Judge Jackson:

I met Alex when he joined Skadden Arps. I was his supervisor for the first six months of his
training contract, and subsequently his work colleague and friend. We maintained our friendship
when I left, first to be a partner at another US law firm and latterly as partner and the head of
corporate law at PricewaterhouseCoopers. I have since retired and am in the process of moving
from London with my family back to my native New Zealand. I consider Alex to be one my
very closest friends.

Alex is my eldest son, G's godfather. G (7) and his brother B (4) know Alex as Uncle Alex, and
Alex has performed his role as godfather and honorary uncle with the same energy, spirit and
kindness that he applies to all elements of his life. He participates fully in our family's important
events and milestones and it has often touched my wife and I how Alex, given his relative youth
- my wife and I are ten years older - makes the trip to our suburban home to do so.

Friendship aside, we chose Alex to be G's godfather because we admire his character and felt he
would be a great role model for and influence over G. Indeed in spite of the recent very stressful
situation he finds himself in, Alex has still found time to FaceTime G, and G enjoys talking to
his Uncle Alex about sports, computer games and what have you.

It was a great joy for my wife and I to hear that Alex and Eva were to have a son: putting aside
the extreme stress the current situation places on Eva - given the wholly positive influence Alex
has had on our family, the idea that Eva and his new son might not benefit from him being
around weighs heavily on our thoughts. Alex will be an excellent father to his new baby and it
would be a tragedy for him not to be there for his young expectant wife and their new baby.

Alex takes his provider role very seriously - he saved for the small flat Eva and he currently
share in London and he worked very hard to provide for his wife on his own. It has been very
difficult for Alex not only to be separated from his friends and family for the last several months,
but to face that his ability to provide for his growing family has been impaired. Alex, it should
be noted, also plays a significant role - if not primary role - in the support of his elderly and

unwell mother. This is not a new thing - I was aware of this from early on in us knowing Alex and as her only son, this will be an impossible support to replace.

Alex worked very hard for his last employer and built up an excellent reputation and made a substantial contribution. Alex completely understands that through his own actions, the career that he built has turned to dust, he keenly feels the loss of this hard won career, as well as the loss of his many colleagues and clients.

I have always admired Alex and am at loss as how he, of all people, is now in the situation he is in. He is hard-working, kind, generous, courteous, respectful and clever. Alex has always had a wide circle of friends, to whom he is very loyal and generous. His openness and willingness to see the best in people has always been one of best qualities. I have never found Alex to be anything other than honest in my many dealings with him and I hope the court can see a way through to showing mercy to him and his young family.


Yours faithfully

Mark Crofskey

# EXHIBIT 4

Eva Khan

● London,

Phone:            ● E-Mail:

Date: 03.06.2018

Honorable Amy Berman Jackson
United States District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,

I met Alex van der Zwaan in the spring of 2016, when I was 20 years old. We instantly clicked and fell in love and were married in June 2017, just over 8 months ago now. I have never felt so comfortable and warm with anyone in my life. It was a wonderful time for both of us and it has unfortunately been shattered by the course of events which led to me writing this letter.

I have been alone since that time in London (visiting Alex on two occasions in the United States). Alex is my husband, my best friend, and my soul mate and, as we recently discovered the father of our son, who is due to be born in August 2018. It has been extremely difficult being separated from my husband during this time, with no one to offer support. It sounds silly but the flat in which we lived in is empty, and I often sit in it alone, looking at our photos in frames on the counter with a slight disbelief that only months ago we shared such joy and happiness, I am deprived of his touch and affection, his reassuring voice and strong shoulder to lean on in my times of trouble. Furthermore, with no one to speak to, I have horrible thoughts entering my head, in a time, which has to be happy for every woman.

I do not have many friends in London, my hometown being Moscow, Russia. Moreover, coming to London for educational purposes at 18, it was very hard to find solid and loyal friends. Young adults can be cruel and unforgiving, for example - many of my acquaintances found it alien that I got married at such a young age, and therefore judged me. However I stood tall, and never turned my back on my culture and heritage. Since our meeting, Alex was always the light of my life and helped me to socialize, his friends became my friends, but I still feel scared to share my troubles and worries, I sometimes go on for days with out speaking my heart out, causing me to be almost paranoid.

The difficulty of the situation has now been exacerbated by my pregnancy:

██████████████████ When I was getting my twelve-week scans done, the ultrasound specialist asked me if my husband came with me for the revealing of the gender of the baby, and I burst into tears as all the women in the waiting room came with their partners. People constantly ask me where Alex is, and I can feel their judgment, although I know he would be with me if he could. Even though we live in the 21st century, there is still huge discrimination against women who spend their pregnancy alone – sometimes people even ask me if my husband knows that I am pregnant, as you can imagine - that is very painful to hear. I have had to deal with all of this without my husband's physical support, and needless to say I am filled with fear and dread at entering the later stages of my pregnancy alone, potentially giving birth alone and having to cope with making arrangements and changes for our son to our apartment alone.

Alex also largely supported me financially, which has now caused him and I difficulties given that he was fired from a job and career at Skadden Arps which he loved, was good at and had spent the past decade putting together, and even having his bosses at our wedding. I will always be proud of him despite this setback, and I pray that his horrible and nerve wrecking experience will not have an emotional effect on him.

Alex also has an elderly mother who lives in Brussels. ██████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████ Despite his busy work schedule, Alex and I would always find time to visit her at her home in Brussels ██████████ and to help her with money, house and garden chores, shopping and simply to keep her company, ████████████████████████████████████████████

██████████████ Alex had recently bought a station wagon so that he could help more with moving things to and from his mother's house, such as a lawnmower, which we bought for his mother on our last visit. We were planning on spending Christmas together this year, but due to Alex's absence, she spent Christmas alone in Brussels. I can only imagine the pain and confusion she felt due to his absence.

This is all to say that, his mother, as well as father, two godsons and I miss him terribly. He was the keystone of our existence and our lives are dramatically changed in his absence. I know him to be a good, law-abiding, loving and trustworthy man. I hope that all of this will not go unnoticed by you, and that he can come back to where he belongs as soon as possible.

Eva Khan

03. 06. 2018

# EXHIBIT 5

# EXHIBIT 6

