```
 1                  IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      ) Criminal Action
                                       ) No. 18-CR-031
 4                       Plaintiff,    )
                                       ) SENTENCING
 5      vs.                            )
                                       ) Washington, DC
 6      Alex Van der Zwaan,            ) April 3, 2018
                                       ) Time:  10:00 a.m.
 7                       Defendant.    )
        _____
 8
                           TRANSCRIPT OF SENTENCING
 9                              HELD BEFORE
                  THE HONORABLE JUDGE AMY BERMAN JACKSON
10                     UNITED STATES DISTRICT JUDGE
        _____
11
                         A P P E A R A N C E S
12
        For the Plaintiff:       Andrew Weissmann
13                               Brian Michael Richardson
                                 Greg Donald Andres
14                               U.S. DEPARTMENT OF JUSTICE
                                 Special Counsel's Office
15                               950 Pennsylvania Avenue, NW
                                 Washington, DC 20530
16                               (202) 514-1746
                                 Email: Aaw@usdoj.gov
17                               Email: Bmr@usdoj.gov
                                 Email: Gda@usdoj.gov
18
        For the Defendant:       William Jay Schwartz
19                               Laura Grossfield Birger
                                 Nicholas Andrew Flath
20                               COOLEY, LLP
                                 1114 Avenue of the Americas
21                               46th Floor
                                 New York, NY 10036
22                               (212) 479-6290
                                 Email: Wschwartz@cooley.com
23                               Email: Lbirger@cooley.com
                                 Email: Nflath@cooley.com
24
        Probation Officers:      Kelly Kraemer-Soares
25                               Renee Moses-Gregory
```

1      Court Reporter:              Janice E. Dickman, RMR, CRR
                                    Official Court Reporter
2                                   United States Courthouse, Room 6523
                                    333 Constitution Avenue, NW
3                                   Washington, DC  20001
                                    202-354-3267
4
                                          *   *   *
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURTROOM DEPUTY:  Good morning, Your Honor.

2     This morning we have criminal case number 18-31, the United

3     States of America v. Alex Van der Zwaan.

4              Mr. Van der Zwaan is present in the courtroom, Your

5     Honor.  The probation officer present for these proceedings is

6     Miss Kraemer-Soares.

7              Will counsel for the parties please approach the

8     lectern, identify yourself for the record.

9              MR. WEISSMANN:  Good morning, Your Honor.  For the

10    government at this proceeding is Andrew Weissmann and Brian

11    Richardson.  And also at the government's table is Greg Andres

12    and Special Agent Omar Meisel.

13             THE COURT:  Good morning.

14             MR. SCHWARTZ:  Good morning, Your Honor.  William

15    Schwartz for the defendant.  And I'm accompanied by Laura

16    Birger and Nicholas Flath.

17             THE COURT:  Good morning.

18             We're here for Mr. Van der Zwaan's sentencing.  Mr.

19    Birger, has the -- the final presentence report was filed in

20    this matter on March 28th.  Have both you and your client had

21    an opportunity to review it?

22             MR. SCHWARTZ:  We have, Your Honor.

23             THE COURT:  I don't believe that there's any factual

24    disputes in connection with the presentence report.  There were

25    some objections to the characterization of his departure from

1     Skadden, but your characterization and the government's are

2     both set forth in the addendum and both sides seem to agree

3     that it wasn't only due to the instant offense, but also due to

4     a breach of Skadden's internal policies and matters that it

5     discovered in a certain investigation.

6          So is there anything else that's in dispute in

7     connection with the presentence report?

8          MR. SCHWARTZ:  We have nothing.

9          THE COURT:  All right.  I'm going to accept the

10    presentence report as my findings of fact.

11         And I don't believe there's any legal disputes that

12    need to be resolved, either in terms of the calculation of the

13    guidelines or anything else; is that correct?

14         MR. SCHWARTZ:  That's correct, Your Honor.

15         MR. WEISSMANN:  That's correct, Your Honor.

16         THE COURT:  So in addition to reviewing the

17    presentence report, I've received additional materials

18    concerning the defendant, including the government's memorandum

19    in aid of sentencing, the defendant's memorandum in aid of

20    sentencing, and a number of attachments to that memo, which

21    included a letter from the defendant's mother, Ludmilla

22    Van der Zwaan; a letter from his father, Rolf Van der Zwaan; a

23    letter from a former colleague at Skadden and a close friend,

24    Mark Cofskey; a letter from his wife, Eva Khan, and; letters

25    from his wife's treating physician.  I've read them all and I

1    appreciate them all.

2         I want to say to members of the public and the press,

3    that to the extent the parties have filed materials that relate

4    to the physical and emotional health of individuals who are not

5    the defendant, that has been sealed or redacted in part.  But

6    there's no other information that's been sealed.  All material

7    that doesn't relate specifically to the health of an

8    individual, other than the defendant, is part of the public

9    record in this case.

10        So, the first thing I need to do in connection with

11   this sentencing -- Mr. Weissmann, you look like you want to say

12   something.

13        MR. WEISSMANN:  I do.

14        THE COURT:  Okay.

15        MR. WEISSMANN:  One other submission, it's -- we

16   submitted yesterday --

17        THE COURT:  The FOIA submission, I received that.

18        MR. WEISSMANN:  I just want to make sure.

19        THE COURT:  In a criminal case there's a statute that

20   tells me how I'm supposed to go about deciding what the

21   sentence should be, it's 18 U.S. Code § 3553.  It list a number

22   of important factors, and the advisory sentencing guidelines

23   are one of the factors that I have to consider in determining

24   the appropriate sentence in this case.  The Court's required to

25   calculate what the guidelines would recommend in every case,

1    and so that's where I'm going to begin, but I know that's only

2    one part of the analysis.

3            In this case, for a violation of 18 U.S. Code § 1001,

4    making false statements to the United States, the base offense

5    level under the guidelines is six.  There are no specific

6    offender characteristics in this case that take it up or down.

7    It is adjusted two levels for his acceptance of responsibility

8    in this case, bringing us to a total offense level of 4.

9            With his criminal history category falling in the

10   Roman numeral I category for no prior criminal convictions, the

11   sentencing guidelines would recommend a sentencing guideline

12   range of between zero and six months, which permits and

13   includes the possibility of a probationary sentence.

14           Would the government like an opportunity to speak

15   regarding the appropriate sentence in this case?

16           MR. WEISSMANN:  Yes, Your Honor.

17           THE COURT:  Okay.  Before you start, I would like to

18   say that it could be helpful for both sides, or either side, to

19   address the question of the defendant's return to correct the

20   record, so I know a little bit more what to make of it.

21           The defendant avoids specifically saying he got home,

22   thought better of it and initiated contact.  And the record

23   reflects that during his interview he was shown e-mails that he

24   had withheld from Skadden.  So one could imagine that when he

25   got back he was questioned about that and that's why he came

1    back.  So, I think that would be helpful.  And I would also

2    like the government to address what it's recommending as a

3    sentence in this case.

4        MR. WEISSMANN:  Yes.  So, in my prepared remarks,

5    Judge, I am going to address the first issue, and I will add

6    the second issue as well.

7        THE COURT:  Okay.

8        MR. WEISSMANN:  So, as the Court is aware, the

9    defendant is an attorney, who after being explicitly warned

10   about the consequences of lying, and being himself represented

11   by four lawyers at Skadden, Arps at the time, went ahead and

12   repeatedly lied to the government.  This is not an isolated

13   incident of bad judgment or criminal conduct.  He had, prior to

14   the November 3rd, 2017 interview, destroyed and withheld

15   documents called for by the Special Counsel's Office and his

16   firm.

17       Now, his prior conduct at Skadden itself was grounds

18   for firing and demonstrated a moral compass that was off

19   kilter.  As the Court is aware from the plea allocution,

20   Skadden had been retained by the Ukraine Ministry of Justice in

21   2012 to write an independent report; the firm had insisted on

22   being able to write such an independent report.  And the value

23   of the report to the world was the fact that it was going to be

24   thorough and independent.

25       That was what was touted by Skadden and by the

1    Ministry of Justice when the report was issued on December

2    13th, 2012, and, in fact, headed by the lead partner on the

3    matter at Skadden, Arps, who is the former White House counsel.

4    But the defendant knew at the time that all of that was being

5    said to the public, that he had undermined that very purpose of

6    what Skadden had been retained to do.

7          He had lied to the senior partner on the matter about

8    what he had done.  He had provided to the PR firm that was

9    retained by the Ministry of Justice an advance copy of the

10   report.  When asked about that by the senior partner he lied

11   and said he had no idea how they got an advance copy.

12         He had also provided to Mr. Gates talking points

13   about how to spin the report, precisely what Skadden had said

14   it was not going to engage in because it was -- did not want to

15   be engaged in spinning the report, it just wanted to be engaged

16   in providing its legal analysis; that's what it had said to Mr.

17   Van der Zwaan and to the world.

18         And in 2016, when Mr. Gates and the person identified

19   as Person A in our papers were in communication with Mr.

20   Van der Zwaan, Mr. Van der Zwaan taped them and the senior

21   partner at the law firm, the former White House counsel, all

22   without telling any of them, including the senior partner.  In

23   other words, the government's position is this is not an

24   isolated incident that came before you of simply making one bad

25   decision on November 3rd, 2017.  There was a history of conduct

1     that is either criminal or shows a real lack of morality.

2          Two points to address in regards to the defendant's

3     submission:  The first is the one that the Court raised about

4     the circumstances of his coming back here.  When one reads the

5     defense submission, one could come away with the impression

6     that the defendant, on his own, thought better of what he had

7     done at the interview and then came back to the United States

8     voluntarily, on his own free will, to correct the record.  And

9     that's not what happened.

10         What happened here is, first, at the interview -- and

11    to be clear, I'm going to refer to the November meeting with

12    the Special Counsel's Office as an interview and the December 1

13    as the proffer.  The second one was not an interview, it was

14    done pursuant to a proffer agreement.  The first one was done

15    as a simple interview, it was not proffer protected.  But there

16    were counsel from both in both sessions.

17         So, first, at the November interview, Mr.

18    Van der Zwaan was caught red-handed because the issue was

19    whether he had made these communications with Mr. Gates and

20    Person A.  And he was shown an e-mail that was supposed to have

21    been turned over to the government, that we had through other

22    means, and he said he had no idea -- he had -- did not

23    communicate and he had no idea why that wasn't turned over.

24         Well, Skadden, as you can imagine, was all over that

25    because they turned to me and said, My God, that may be a

1      mistake that we made, we have to go check our records to see

2      why this didn't get produced to you.  They had explained that

3      the way they had done document production is they had counted

4      on each of the custodians to go through their records and

5      produce them.  And so they quickly realized what had happened,

6      which was they had not been given this document, and they were

7      all over it.

8            Second, at the end of the first interview, Mr.

9      Van der Zwaan was given a grand jury subpoena to be in the

10     United States on a date certain.  He had to come back to the

11     United States to be -- I'm not saying he had to come to the

12     proffer session, but he had to come back to the United States.

13     It would have been a separate, independent crime for him not to

14     show up because he was validly served with the grand jury

15     subpoena, as would be a common practice for a witness who was

16     an overseas witness where we wanted to make sure that his

17     testimony would be available to the grand jurors.

18           Third, he did provide Skadden with the three

19     tape-recordings that he had made, but those three

20     tape-recordings were made on a Skadden device, they belonged to

21     Skadden and Skadden had a right to them.  And so, there was no

22     Fifth Amendment ability for him to not produce those to

23     Skadden; they demanded that those be produced and they had

24     every right to, as his employer, to ask that those be given to

25     them.  He does not deserve credit for doing something that he

1     was not legally entitled not to do.

2          Fourth, it is true that he did not destroy those

3     tapes.  But, again, not committing a crime is not something

4     that deserves credit, in the government's view.

5          And then finally, with respect to the proffer, the

6     actual meeting, that was a meeting that his -- that was done

7     with the Special Counsel's Office and it was pursuant to a

8     proffer agreement.  As you can see, that is not something that

9     we have used to prosecute the defendant, or even at sentencing.

10    There was no grand admission that is being used here to

11    prosecute him.  The case was made already.  That proffer

12    session, I submit, was something that was done more for -- as

13    an opportunity for the defendant to explain himself and for

14    counsel to explain why he should not be prosecuted.  And those

15    arguments were made to the Special Counsel's Office and they

16    were rejected.

17          I would like to also briefly address the arguments

18    made about motive that are in the defense submission.  Now, to

19    be candid, we don't know precisely what was motivating the

20    defendant in his actions.  He could have been motivated, in

21    part, by not having his employer know that he had taped the

22    senior partner.  I think there's reason to doubt that that is

23    the -- certainly, the sole motive that was going on here.

24    Because it simply is not the case that saying that you spoke to

25    Person A, to Mr. Gates, and to the senior partner would have

1    necessarily led to being discovered that he had taped them, let

2    alone that he had taped the senior partner.  Indeed, we know

3    that he has taped other people -- and that's something we

4    independently know, not because of something that he told us.

5    So it's not the case that simply saying that he had

6    communication would have necessarily revealed the

7    tape-recording.

8            He also could have taken the course of action he did

9    simply to protect himself.  If you look at the tape-recordings,

10   they talk about potential Ukraine criminal conduct.  And in one

11   of the tapes, the tape with Person A, Person A says that what's

12   going on in the Ukraine could be bad for both Person A as well

13   as Mr. Van der Zwaan.

14           It also could be the case that he lied to protect Mr.

15   Gates and Person A, who he became very friendly with and, as we

16   submit, too close with in terms of carry out his professional

17   duties.  In other words, that friendship overtook his

18   obligation to tell the truth to the government.

19           One thing that we know is definitely not a motive, is

20   we know he was not motivated to lie by a desire to keep from

21   Skadden that he had been considering leaving Skadden to work

22   with Mr. Manafort and Mr. Gates.  The defendant claims this in

23   his papers on page 6.  He says:  Alex has explored

24   opportunities to leave Skadden to work directly for Gates and

25   Manafort and he corresponded with them about the possibility on

1    Gmail.

2         Again, Alex did not want his employer to see these

3    emails.  We know that's wrong.  And how do we know that?  We

4    know that because the defendant talked about the possibility of

5    working with Mr. Manafort and Mr. Gates with people at Skadden,

6    both above him and below him, at the time that this was going

7    on.

8         Further, he told Skadden lawyers about this prior to

9    the November interview, when we were given a proffer of what he

10   would say by the Skadden lawyers representing him at the time.

11   It included the fact that he had sought a position with Mr.

12   Manfort and Gates.  And at the actual interview he told us that

13   in front of four Skadden lawyers.  So one thing we know is that

14   cannot be a motive.

15        Now, in assessing all of this I would submit to the

16   Court that this is not an either/or.  The Court need not choose

17   one or another, and it can be a combination of those.  But one

18   thing we do know is in order to carry out any or all of these,

19   it had to encompass lying to the Special Counsel's Office.  And

20   that's -- in order to accomplish any of those motives, that was

21   a necessary part of what he did, both lying to us and

22   withholding documents.

23        Now, two final points.  We take seriously the effect

24   a sentence here would have on people who are completely

25   innocent.  By that I'm referring to the defendant's wife.  One

1    of the things that struck us when we read the defense

2    submission, was on -- I think it was the very last page, there

3    was a concern raised about if there was a term of incarceration

4    that was going to be imposed, that there was some uncertainty

5    about how long it would take ICE to remove the defendant

6    because he wouldn't -- he's not a citizen here.

7           So one of the things we did is we spoke to ICE.  We

8    spoke to other prosecutors who have had that situation and

9    offered to the defense a removal on consent and sent them

10   sample paperwork, and that would have guaranteed that the

11   defendant would be -- if there was a term of incarceration and,

12   frankly, even if there weren't a term of incarceration, that

13   the defendant would be removed within 48 to 72 hours.  Defense

14   counsel rejected that on Friday.

15          So, we do think that there is a way to accommodate

16   the interests of and have to minimize the harm to --

17          THE COURT:  Was there an ICE detainer in this case?

18          MR. WEISSMANN:  There isn't an ICE detainer in this

19   case, that I know of.  I do know that ICE is aware of Mr.

20   Van der Zwaan's situation.

21          THE COURT:  But if he had his passport, could he --

22   after he had served whatever sentence I impose, could he simply

23   self deport?  Or would they take him into custody?

24          MR. WEISSMANN:  I think they would take him into

25   custody, based on what I understand from ICE as of yesterday

1    afternoon.

2              THE COURT:  Doesn't there have to be some document,

3    some detainer, some action that they've initiated?

4              MR. WEISSMANN:  I believe -- I don't -- frankly, I

5    don't know the answer to that question.

6              THE COURT:  Okay.

7              MR. WEISSMANN:  So, I could find out, but I don't

8    want to speculate --

9              THE COURT:  All right.

10             MR. WEISSMANN:  -- on that.  Here, the paramount

11   interest that the government has, as I know the Court is aware

12   in terms of it being a relevant consideration, is that the

13   sentence here -- and this goes to one of the two things that

14   the Court asked me to address -- is that the sentence here

15   reflect the gravity of the offense and also provide for general

16   deterrence.  We count on people to tell us the truth.  We count

17   on people to turn over documents that are called for and are

18   responsive.

19             That is how this and most every government

20   investigation works, big and small.  People need to know there

21   are consequences to withholding documents and there are

22   consequences to lying to the government, particularly for a

23   lawyer who, of all people, should know better and has a duty as

24   an officer of the court to uphold the law, not to violate it.

25             With respect to the Court's question with respect to

1    a specific sentence, the Special Counsel's Office would like to

2    follow the procedure where we give the Court our assessment of

3    the pertinent facts, but leave to -- out of, frankly, out of

4    respect for the Court, that the decision as to what the exact

5    sentence is is one that really is for the Court, rather than us

6    proposing a sentence.

7            I have to say, I was raised in a district where that

8    was the standard practice.  And so unless pressed --

9            THE COURT:  I'm not going to press you.  It was clear

10   from the sentencing memorandum -- well, you didn't make any

11   recommendation, not even saying a sentence of incarceration.

12   It was clear when you said that nothing else would do, that

13   that's what you were seeking.  So I thought if you had a

14   recommendation or request, I would solicit it.  But I'm not

15   going to press you; I understand what you're saying.

16           MR. WEISSMANN:  Judge, I completely appreciate the

17   opportunity, and it really is out of respect for the Court that

18   what we try to do is give you all of our views about what we

19   think is important.  Obviously, though, we understand it's a

20   very difficult part of being a judge.  But we leave it to the

21   Court to take the mix of what the government says and the

22   defense says.

23           THE COURT:  All right.

24           MR. WEISSMANN:  Thank you.

25           THE COURT:  Thank you.

1          All right.  Counsel for the defendant.

2          MR. SCHWARTZ:  Thank you, Your Honor.  Before I

3    begin, I would just want to acknowledge that a number of

4    people, family and friends of Alex's have traveled from around

5    the world -- nobody from the United States -- including his

6    father who is here, someone who has flown from as far away as

7    New Zealand.  As Your Honor knows, neither Alex's wife nor

8    mother could attend, and Your Honor is aware of the reasons for

9    that.

10         Before I begin, Your Honor, I just want to -- my

11   prepared remarks, I just want to take -- make a couple of

12   points about Mr. Weissmann's statement.

13         THE COURT:  And I want to ask you a question at the

14   beginning that you can weave in wherever you want to:  I still

15   have the issue about his return to this country.  But, also,

16   you've advocated a fine, and at some point I would like to know

17   if there's a particular level of fine that you believe would

18   satisfy the statutory purposes of a criminal sentence, given

19   the defendant's access to the means to pay a fine.

20         MR. SCHWARTZ:  I understand, Your Honor.  I will

21   address that.  And if I forget, I'm sure Your Honor will remind

22   me.

23         THE COURT:  All right.

24         MR. SCHWARTZ:  On the question of his return, Mr.

25   Weissmann says he had no choice to return because he had a

1    grand jury subpoena.  The reason Alex returned was to meet,

2    again, with the government.  And now Mr. Weissmann points out,

3    correctly, that he met again with the government under a

4    proffer agreement.

5          When Alex returned -- decided to return to the United

6    States -- indeed, after he returned to the United States -- he

7    did not know that it was possible to receive protection from

8    meeting with the government.  He had met with the government

9    the first time, unprotected by a proffer agreement.  And I

10   know, because it was not until I told him -- and he was

11   planning to return when I met him, he was in the United States,

12   and he was planning to meet with the government a few days

13   hence.  And I told him he could do that under a proffer

14   agreement, and that was the first time he had ever heard that.

15         He came back here to correct the record, grand jury

16   subpoena notwithstanding.  He could have gone to the grand jury

17   and taken the Fifth Amendment.  He came back here to correct

18   the record, not knowing he could be protected in doing that.

19   And he came back here to correct the record because he

20   realized -- and he realized late, should have realized earlier,

21   we concede that, that's why he's sitting here today -- he

22   realized he had made a terrible mistake, that he had broken the

23   law.

24         The second thing that I want to address that Mr.

25   Weissmann said was -- has to do with Alex's motive.  And he

1    said, you know, the tapes are about other things and maybe --

2    maybe, he didn't have any definitive theory -- maybe it's

3    because of what the conversations were about.

4           The fact is, Alex reported those conversations

5    contemporaneously with Skadden.  Skadden was aware of what had

6    taken place on the phone calls.  The only thing that Skadden

7    was not aware of was that Alex had taped the calls.  And it was

8    the tapes -- because he knew that was a fireable offense,

9    particularly taping Mr. Craig -- it was the tapes that caused

10   him to want to stay away because Skadden had just -- this had

11   not come up in his preparation and Skadden didn't know whether

12   they would get there or not get there; he wanted to stay away

13   from that topic, he avoided it.  It was stupid, it was

14   irrational, and he's being punished, having been convicted of a

15   crime for having done it.  There is nothing on the tapes that

16   is about another crime.

17          THE COURT:  I don't understand what the tapes have to

18   do with withholding the emails.

19          MR. SCHWARTZ:  I'm going to get to the emails in a

20   second.

21          THE COURT:  All right.

22          MR. SCHWARTZ:  The emails which Mr. Weissmann refers

23   to as destroyed, which were in fact deleted emails from Alex.

24   Alex withheld emails from Skadden that were in Skadden's

25   custody and then he deleted emails from his own Gmail account.

1              Mr. Weissmann argues that those -- that Skadden knew.

2     The people that he would talk to, Manafort and Gates -- the

3     people that he was dealing with in this investigation did not

4     know that fact, that he was looking for work three or four

5     years earlier with Manafort and Gates.  And the emails that he

6     deleted, he deleted online.  Having done that and then having

7     found out that they were required by the government, he turned

8     over his computer, which he hadn't used in several years, that

9     had those very emails on it.  And we believe that all the

10    emails that he deleted online were in that computer.  And he

11    told Skadden that -- about what those -- that email traffic was

12    about, which was getting a job with Manafort and Gates.

13             All that took place before he ever came to the United

14    States the first time.  And the reason the government knows he

15    deleted the emails is that he told them that in his proffer, in

16    the second proffer.

17             THE COURT:  He told Skadden about it before he came

18    the first time or before he came the second time?

19             MR. SCHWARTZ:  Before he came the first time Skadden

20    was aware -- Skadden may not have been aware that he deleted

21    the emails.  Skadden was aware -- Skadden had the e-mails in

22    the computer.

23             THE COURT:  All right.

24             MR. SCHWARTZ:  Then found out, shortly after that, he

25    had deleted them, and he did tell them that.

1          THE COURT:  All right.

2          MR. SCHWARTZ:  Because it was something they knew

3     when I came into the case.

4          THE COURT:  You came into the case after he had been

5     confronted with an email that he hadn't produced?

6          MR. SCHWARTZ:  I came into the case when he

7     voluntarily came back to the United States to correct the

8     record, not knowing that he could do it in a way that protected

9     him from prosecution for the statements he was going to make in

10    a proffer session.  That's when I met him.  And I met him after

11    his passport had been taken by the government.  That's how I

12    met him.

13          So, I'll -- the issue of the ICE detainer, which I

14    was going to come to later.  Yes, Mr. Weissmann offered us a

15    stipulation, that he had represented to us had worked in

16    another case.  I don't know whether that would work in this

17    case or not in this case.  Mr. Van der Zwaan is hoping that he

18    can voluntarily leave the country without being incarcerated.

19    If he is incarcerated, he is going to have to go through some

20    ICE process.  Whether that stipulation would have prevented

21    that process from taking place, I just don't know.  I just

22    don't know.  And so we did not agree to that.

23          It also -- if Your Honor were to sentence him to a

24    noncustodial sentence, he could depart voluntarily, without

25    being deported, and that could have implications some day in

1    the future if he were -- if he desired to return to the United

2    States.  He might not, in any event, be allowed to return to

3    the United States.  But if he's deported, he surely would not

4    be allowed to return to the United States.

5          So we turned that deal down.  ICE still hovers there,

6    and it's not because of a deal that we rejected.  ICE is there

7    and ICE is going to be there and who knows what they're going

8    to do there.

9          So, Your Honor, this case carries a very low

10   guideline.  And -- but it's different in several significant

11   respects from other cases that carry the same low guideline,

12   and particularly other false statement cases, for several sets

13   of reasons, the first which I've just addressed in some detail

14   are the steps that he took to return to the United States to

15   correct the record, which is why he came back.  He didn't come

16   back for any other reason.

17         He was in a foreign jurisdiction.  Even with the

18   grand jury subpoena, he decided that he had to admit the lies

19   that he had made, and he was back here within two weeks.  It

20   was extraordinarily quick.  He handed over notes that he had

21   taken of the phone calls which were the subject of the false

22   statements, gave them to Skadden, who gave them, before he

23   returned to the United States, to the government.

24         He handed over the tapes of the two conversations

25   with -- the conversation with Person A, the conversation with

1    Mr. Gates, and the conversation with Greg Craig.  The tapes

2    were definitive proof.  He didn't know what proof the

3    government had of actual conversations.  I don't know to this

4    day whether the government had proof of actual conversations

5    having taken place after that email was sent to him.

6              He handed over proof that the conversations had taken

7    place.  And the best proof of their subject matter is on the

8    tapes themselves.  He definitively proved his own lie.  And he

9    turned those over to Skadden before returning to the United

10   States.  And the government -- and Skadden turned them over to

11   the government at about the time that he returned to the

12   United States.

13             And the government says he shouldn't get any

14   mitigation credit for having done that.  I think another way to

15   look at it is it's unusual -- it's unusual conduct, in the

16   least, to make a false statement and then to immediately

17   provide the ultimate proof of the false statement.  And I

18   suggest that other defendants who might be standing here with a

19   zero to four guideline for making the same false statements

20   might not have done that, they might not have told Skadden

21   about tapes they didn't know existed.  That device might have

22   found its way to the bottom of the Thames, if that person was

23   in London.  It didn't, it found its way to Skadden.  The tapes

24   found its way to the government.  The record was corrected in

25   the most conceivably dramatic way it could possibly be

1    corrected, and it was corrected by Alex Van der Zwaan.

2           This is precisely the kind of conduct, Your Honor,

3    that should be considered by the Court in sentencing,

4    particularly if Your Honor is considering a guidelines

5    sentence, where within that guideline.  And we think, of

6    course, at the very bottom the sentence should be imposed.

7           Further, when he returned to the United States, he

8    turned over all of his devices, he brought them with him from

9    England, including personal devices, not just Skadden-owned

10   devices.  And he turned over all those devices to Skadden to be

11   turned over to the government.  In the case of a damaged Apple

12   device that he could not access, he provided multiple consents

13   that were requested by the FBI for Apple so that Apple could

14   search the device.  He did whatever he could to correct this

15   record.

16          Finally, he did meet with the government and he

17   admitted what he had done.  And he told them, he told them

18   about what the government calls destruction of emails and not

19   turning over the emails.  He admitted that in the meeting with

20   the government.

21          The second thing that makes this sentencing, I think,

22   unusual are the personal circumstances that surround it.  I

23   know Your Honor sentences many people and many of them have

24   difficult personal circumstances, and I don't want to minimize

25   that.  I want to focus only on Alex's personal circumstances.

1        There was a risk in returning to the United States,

2   even with a subpoena, and that risk was that Alex could be

3   arrested.  He was, effectively, arrested.  While he has not

4   been put in jail and bailed, he has not been able to leave, and

5   he's not been able to leave the country and to go home.  And

6   he's now, almost immediately, turned over his passport.

7        He's now been here well over four months, in a

8   foreign country, without a home, without his wife, and without

9   the rest of his family.  As Your Honor knows, he's living in a

10  residence hotel, with no job, with no routine, with nothing to

11  do.  He is, literally, in limbo.  It's a -- he is the first

12  client I have ever had who tells me that the highlight of his

13  day is talking to me.  And when we get off the phone he says,

14  Please call me back soon.  This is a very difficult

15  circumstance that he is in.

16       While he has been here in limbo, he's learned that

17  his wife is pregnant.  And then when she was here visiting him

18  at the very beginning and then when she returned, he learned

19  that the pregnancy is a difficult one and that she would not be

20  returning here again.  This, of course, exacerbates the

21  separation that he has had to go through; it exacerbates it for

22  him and exacerbates it for his wife, with whatever effect that

23  might have.  Your Honor has materials.

24       It puts them both under enormous stress and strain.

25  He had to wait, without knowing what was happening or what

1      would happen, until mid-February.  From the beginning -- from

2      the end of November to mid-February before the government made

3      its decision.  He's had to wait from mid-February to now to get

4      an ultimate decision.  I'm aware that many defendants -- and

5      I've represented many defendants -- face similar uncertainties

6      in their life awaiting judgments of the Court.

7              What makes this different is that it is exacerbated

8      by the fact that unlike almost any defendant I've ever

9      represented, he's untethered to his normal routines and

10     surroundings.  Every call from us, every call from home brings

11     anxiety and uncertainty, and then he has no one to turn to

12     after the call for comfort.  He has no routine to take his mind

13     off what's going on in his life and he is -- has to suffer from

14     what I think is almost a lethal combination of boredom and

15     anxiety waiting for the sentence.  It's something that I think

16     is a deeply mitigating factor in this sentence.

17             The government talks about Mr. -- I want to address a

18     few of the points they made in their submission and also made

19     today, that he's a lawyer.  He is a lawyer.  Or, he was a

20     lawyer.  I guess he's technically still a lawyer.  Lawyers have

21     ways of disciplining their own.  And in this case, for this

22     crime, I believe that's more than an adequate sentence.  He has

23     lost his job, he's highly likely to lose his license.  He's got

24     to self-report under his bar rules.  And in any event, the

25     case, as Your Honor can imagine, has received very substantial

1    coverage in the United Kingdom.  It's not going to come as a

2    surprise to anybody that we're standing here today or that he's

3    convicted, or to the bar.  He's going to go home without a

4    profession or career.  He had a career.  He was ten years at

5    Skadden.  Yes, Skadden did terminate him, and there were other

6    things that were involved.  But that career is over.  He's not

7    going to be able to put it back somewhere else.

8             The government, in their sentencing submission -- and

9    Your Honor asked what fine should be imposed.  We would

10   recommend that Your Honor impose a fine within the guidelines.

11   It goes up to $9500, but Your Honor is aware of Mr.

12   Van der Zwaan's personal financial circumstances.  And I -- we

13   would understand if Your Honor decided to impose, based on

14   those circumstances, a fine above the guidelines.  You know,

15   while we want a guidelines fine, Your Honor, we obviously

16   understand that there could be a higher fine here.

17            The government suggests that you consider, in

18   determining what fine to impose, that you consider his

19   father-in-law's wealth.  And for reasons -- and, frankly, I was

20   stunned to see the gratuitous reference to his father-in-law in

21   their papers as an oligarch, as if that has some bearing, or

22   what their characterization is has some bearing on Mr.

23   Van der Zwaan.  And a cite to a civil case involving his

24   father-in-law; another gratuitous citation involving his

25   father-in-law, a case that has nothing whatsoever to do with

1    Alex.

2              THE COURT:  I'm not sentencing his father-in-law.

3              MR. SCHWARTZ:  I'm sorry, Your Honor?

4              THE COURT:  I have no intention of sentencing his

5    father-in-law.

6              MR. SCHWARTZ:  Your Honor, you know what Alex's

7    assets are, they're in front of you in the probation report.

8    They're not -- he's not wealthy, but they're substantial

9    enough, I'm sure, to pay whatever fine Your Honor imposes, and

10   he's prepared to pay that fine.

11             Finally, in their papers, Your Honor, the government

12   has suggested that it's sufficient if Alex gets home -- if Your

13   Honor decides to incarcerate him, as long as he can get home in

14   time for the birth of his child.  Your Honor, Eva Kahn, Alex's

15   wife, is going through -- is now in her sixth month of a

16   difficult pregnancy; going into her sixth month.  She needs him

17   now, not three months from now, four months from now, in the

18   birthing room.  This is something that time has come for him to

19   go home.

20             We don't know what will happen even if Your Honor

21   imposes a short term of incarceration, how long ICE will detain

22   him, whether stipulations will work or will not work.  One

23   thing is almost sure, which is that that term could get

24   extended.  The surest way to get him home in time to aid his

25   wife towards the end of her pregnancy is to permit him to

1    voluntarily depart.

2           Finally, Your Honor, we know this is a highly

3    publicized case, I think for reasons probably having nothing to

4    do with Alex.  And it's coming as part of a very significant --

5    and at least in my lifetime, one of the most closely watched

6    investigations in this country.  And I just urge the Court to

7    put all that aside and to sentence Alex Van der Zwaan for what

8    he did that was criminal, what he did to correct what he did

9    that was criminal, and for who he is.

10          Your Honor, we would ask that you sentence him to a

11   fine without a sentence of incarceration, and to -- if Your

12   Honor feels that you need to find some way to assure that he

13   leaves the country -- although I don't think you need to be

14   concerned with that -- Your Honor could sentence him to a short

15   term of probation with condition that he voluntarily leave

16   within a set period of time.  Thank you.

17          THE COURT:  All right.  Thank you.  Mr.

18   Van der Zwaan, is there anything you would like to say that you

19   would like me to consider before I impose sentence in this

20   case?

21          THE DEFENDANT:  Your Honor --

22          THE COURT:  You can come up to the lectern, if you

23   want to speak.  If you don't want to speak, you don't have to.

24          THE DEFENDANT:  Your Honor, what I did was wrong.  I

25   apologize to the Court for my conduct.  I apologize to my wife

1    and family for the pain I've caused them, and I await the

2    judgment of this Court.

3            THE COURT:  All right.  Thank you.  At this point I'm

4    going to take a break.  I need to leave the bench and kind of

5    absorb all this.  You can all remain seated.  I think it will

6    probably be about 15 minutes when I return.  Thank you.

7            (Recess.)

8            THE COURTROOM DEPUTY:  Your Honor, recalling criminal

9    case number 18-31, the United States of America v. Alex

10   Van der Zwaan.  Mr. Van der Zwaan is present in the courtroom,

11   Your Honor.

12           THE COURT:  All right, Mr. Van der Zwaan, you and

13   your counsel can return to the lectern.

14           MR. SCHWARTZ:  Your Honor, did you invite us to the

15   podium?  I didn't hear.

16           THE COURT:  Yes.  As I stated at the outset, Congress

17   has a statute that tells judges what they're supposed to

18   consider when they sentence someone.  So under 18 U.S. Code

19   § 3553 I'm supposed to consider a number of factors, and I'm

20   going to go through each of them.  And it may take a little

21   time, but I think they're all important.

22           The first thing I'm supposed to think about is the

23   nature and circumstances of the offense or, as your lawyer put

24   it, what he did.  And I assure you that's what I'm focused on.

25           The defendant came to the United States to meet with

1    the Office of Special Counsel, knowing that the office was

2    interested in his work while he was at Skadden with Paul

3    Manafort and Richard Gates on behalf of the Ukraine Ministry of

4    Justice.  Defendant was a lawyer himself, he'd been associated

5    with a firm that is based in the United States for ten years.

6    And he was represented by counsel in the interview.

7            In response to several questions that were material

8    to the investigation, he lied.  He knew the questions were

9    important, and he knew his answers were false at the time he

10   gave them.  These are not mistakes; these are lies.  You can't

11   say that he was frightened by the circumstances, kind of a

12   deer-in-the-headlights who made the wrong call in the heat of

13   the moment and then rectified it.  This was not a momentary

14   lapse.  He had started lying and covering up before that

15   moment.

16           He withheld relevant evidence from his own lawyers

17   and law firm when he was asked to produce records that were

18   responsive to the Office of Special Counsel's request.  He

19   withheld some, he deleted others.  And he clearly wasn't

20   truthful with his own team in preparation for the interview.

21           Yes, he came back to this country, and, yes, he

22   corrected the record.  But there's still a little gap where no

23   one is actually telling me that he initiated this.  The

24   admission that he lied and he held back evidence does not seem

25   to have been prompted so much by a change of heart, as by the

1     fact that with his Skadden lawyer sitting there he was

2     confronted during the interview with a copy of an email to

3     which he was a party that he had not produced to his own

4     lawyers.  He was essentially caught red-handed.

5           So, I do give him credit for the fact that he was

6     truthful and for the fact that he came back, but there is some

7     reason to believe that his own attorneys played some role.  I'm

8     told while he wasn't actually trying to mislead the Office of

9     Special Counsel, the explanation is that he was trying to hide

10    what he'd done, recording his calls with his own partner and

11    some of his communications with Mr. Gates, and talk about

12    joining Manafort and Gates from the firm.  I'm just not sure

13    that helps.

14          Several of the letters emphasized the loss of his job

15    and other events that befell him afterwards and describe his

16    present situation as tragic or a tragedy.  And I'm not sure

17    that fits.  This is not something that happened to him.  He

18    didn't suffer unavoidable circumstances of tragedy; that was

19    something he did.

20          Even if he didn't set out deliberately to subvert or

21    obstruct the investigation, or to cover up for Mr. Manafort and

22    Mr. Gates -- and it's not clear that that wasn't part of his

23    motivation -- the fact that he lied, as the defense told me,

24    because he was afraid that his disloyalty to the firm would be

25    discovered doesn't justify it.  The fact is that even according

1    to his own theory he put his personal interests ahead of the

2    interest of justice.  That is hardly an excuse, that's hardly

3    an exigent circumstance, and particularly not if you're a

4    lawyer.

5          Lying would be wrong in any criminal investigation,

6    and this investigation also involves important questions of

7    great national and international interest; it involves our

8    country's and probably other countries' national security, and

9    the prospect of potential foreign interference in the

10   democratic processes that are fundamental to our freedom.  So

11   there's not much good that you can say about the nature and

12   circumstances of the offense.  And to be fair, the defense

13   doesn't talk about them much at all.

14         But that's not all I'm supposed to think about.  I'm

15   also supposed to think about the history and characteristics of

16   the defendant; who you are, not just what you did.  Your

17   parents have attested to your very loving and supportive

18   upbringing and your intelligence and your facility with

19   languages.  You studied law at King's College at the University

20   of London and graduated with the highest honors.

21         You spent the next years at the London office of

22   Skadden, first as an apprentice and then afterwards becoming a

23   solicitor.  You were admired and respected by your colleagues.

24   You're clearly a smart and up-and-coming young man.  You were

25   successful at the firm and on track to achieve the next

1    milestone there.  And all this speaks well of you and all of it

2    is a factor in your favor.  But it also all establishes that

3    you knew better, and that you knew what you were doing at the

4    time you did it.

5          This is a gentleman who cannot point to a lack of

6    advantages or education or role models or guidance in his

7    upbringing to account for the lack of judgment in this

8    instance.  And there were no desperate circumstances that

9    weakened his judgment.

10          But it is also fair to say, as part of his history

11   and characteristics, that he did ultimately take responsibility

12   for his actions; returned to the United States, corrected the

13   record, produced the evidence, and entered a guilty plea.  And

14   do I give him credit for that.  I'm just not sure -- I believe

15   the defense may be overestimating the amount of credit he gets

16   for that.

17          His letter-writers also stress his maturity and

18   self-reliance.  This is someone who endeavored to support

19   himself and, until recently, his wife on income he earned, and

20   he accumulated savings that way.  It doesn't appear that the

21   significant monthly contributions from his father-in-law began

22   until he lost his job with his law firm and was incurring legal

23   fees himself.

24          He's been hard-working and kind and generous with his

25   friends.  He's also a major, sort of, financial and emotional

1    support to his mother.  Her activities are compromised by her

2    physical condition.  And while he doesn't care for her on a

3    daily basis, he does visit her and helps her out when he goes

4    there.  He's also deeply loved by his new wife, deeply missed

5    at this important milestone in their marriage, at a time of

6    physical and emotional difficulty for her.

7           He's facing an uncertain future in the law in light

8    of this conviction.  His conduct has led to his loss of a job

9    at Skadden, although it's not merely due to the conviction, but

10   conduct against the firm policy and against firm interests,

11   including withholding interests from the firm.

12          So, it appears that there was a point when the

13   steadfast loyalty and commitment to the firm and the giving of

14   his heart and soul that was described in some of the letters

15   became somewhat diluted.  The presentence report and the

16   pleadings really don't shed light on the mix of motivations

17   here and, frankly, they are no clearer to me today than they

18   were when I was thinking about this in advance of today.

19   There's quite a bit they don't say.

20          Perhaps, through his work with Mr. Manafort and Mr.

21   Gates, this defendant became attracted to the more active,

22   get-things-done role that they played, in contrast to the staid

23   role that lawyers play.  Maybe his head was turned by the money

24   they made, I don't know.  But he took steps to ingratiate

25   himself with them that were not necessarily sanctioned or known

1   by the firm, and in the end, that's why he lied.

2          The statute also tells me that I'm required to impose

3   a sentence that's sufficient but not greater than necessary to

4   accomplish the purposes set out in the statute.  And,

5   therefore, another factor I have to consider is the need for

6   the sentence to do a number of things:  To reflect the

7   seriousness of the offense, to promote respect for the law, and

8   to provide just punishment for the offense, to afford adequate

9   deterrence to criminal conduct, not just by him -- which I

10  think has probably largely been accomplished -- but by others.

11         I'm supposed to consider whether I need to protect

12  the public from further crimes of the defendant.  I don't think

13  that's a big issue here.  And I'm supposed to provide the

14  defendant with needed educational or vocational training or

15  medical care or other correctional treatment; that's not an

16  issue here.

17         I'm supposed to think about, well, what kinds of

18  sentences are available?  I'm supposed to think about the need

19  to provide restitution for any victims, which is not relevant

20  here.  And I'm supposed to think about the need to avoid

21  unwarranted sentencing disparities among defendants with

22  similar records who have been found guilty of similar conduct.

23  In other words, your sentence has to be fair when you compare

24  it to the sentence that other people get that did similar

25  things.

1          And all of those factors point in a number of

2    directions.  It's fair to say that a number of people who

3    violate section 1001 might get a substantial term of probation

4    and community service.  This was not an ongoing and

5    sophisticated fraud, so an extremely harsh sanction could be

6    greater than necessary.  You didn't pose a threat to public

7    safety.  And the guidelines reflect all of that.

8          But that was more than a mistake, it was more than a

9    lapse or misguided moment.  The lie to the prosecutors was in

10   the context of an ongoing cover-up of the facts and the

11   withholding of records, regardless of what the motivation was.

12   And so under those circumstances, the concerns about fairness

13   and avoiding sentencing disparities and deterrence become

14   extremely important.

15         I also have the consideration here that a lengthy

16   period of probation is not appropriate, given the family

17   considerations I've been asked to think about and the

18   defendant's need and desire to return to London.  I can't just

19   keep him under my supervision for an extended period of time

20   while he does hundreds of hours of community service and makes

21   restitution, which isn't applicable anyway, which is what I

22   might do in many white collar cases.  The defense tells me he's

23   got to go, and he's got to go now.

24         Now, Mr. Van der Zwaan, I have been told that you are

25   an upstanding, fine person and the fact that you have pled

1   guilty and had to deal with all the consequences of your

2   actions has satisfied all the goals of this statute.  And you

3   certainly do appear to have many redeeming characteristics and

4   people who love you and support you, and not everybody can say

5   that.  And so I want to assure you that nothing that happens

6   here today can take any of that away.  You have skills to offer

7   the community, as well as your family, even if it turns out

8   that you're not practicing law.  They'll all serve you well in

9   the future.

10          I assure you that while this may feel right now like

11   the most momentous day in your life, much of the story of your

12   life, indeed the majority of the story of your life, has yet to

13   be written.  It's particularly true in your case, given the

14   chapter that's about to begin when your first child is born and

15   you feel like nothing has ever happened before that.  You're

16   going to have the chance to live the rest of your life as a son

17   and your entire life as a father, in accordance with the values

18   and the principles that you've been taught along the way, and

19   your friends and family tell me you haven't forgotten.

20          But it falls to me to address a different chapter.

21   The defense has asked for a sentence that consists solely of a

22   fine so that you can return to your wife and start visiting

23   your mother again.  And those facts that I've been asked to

24   consider really don't differentiate this defendant

25   significantly from the people who stand before me every day.

1          There are people who are forced to accept severe,

2    sometimes mandatory consequences of nonviolent criminal

3    activity, and that activity didn't involve dishonesty and may

4    have been prompted by greater financial pressures or the lack

5    of opportunities and upbringing that this man enjoyed.  I often

6    find myself sentencing individuals with ailing parents,

7    pregnant wives, and needy children.  And few, if any, have the

8    resources this family has to sustain itself.

9          The good news is that in this case, unlike so many

10   others who have come before the Court, this family does have

11   the financial and emotional resources to get through difficult

12   times.

13         I've been told that this defendant has been punished

14   enough because his life has been shattered.  And I am taking

15   into consideration the fact that there will be collateral

16   consequences in connection with his job.  But this glass was

17   dropped on a very thick carpet and it's cushioned the blow.

18         I've been told he was effectively arrested.  And I

19   recognize that there's been some depravation associated with

20   the enforced stay in Washington, D.C., but I'm not terribly

21   moved by the complaint that he was in his hotel all day with

22   nothing to do and it's deeply mitigating that he was suffering

23   from boredom.

24         This is not the character in *A gentleman in Moscow*

25   who was required to stay in his hotel all day.  And I guess I

1    find it a little surprising that with all of this legal fire

2    power behind him he wasn't encouraged to go out and do

3    community service on his own while awaiting his sentence,

4    especially given his compliant that he had nothing to do.

5         I also was a little surprised that while he got his

6    mother and father and best friend and wife to write me letters,

7    that the accomplished lawyer didn't write one himself.  I have

8    to say that the expressions of remorse here by the defendant,

9    and even those on his behalf, were somewhat muted, to say the

10   least.  And there's been some lip service to remorse for what

11   he's done, but much more expressing sorrow for what he's had to

12   go through, which is different.

13        I do want to acknowledge, and I don't mean to

14   minimize the suffering that your absence has caused your wife

15   and family members, it's real and they did nothing to bring it

16   on themselves.  And I don't mean to harp on this or rub salt in

17   the wound, but given the emphasis that was placed on this in

18   the sentencing papers, I have to observe that those are

19   collateral consequences that flow from your own actions and not

20   something that I can look at as a substitute for a criminal

21   sentence.

22        I also have to say that the request that you be able

23   to pay a fine and leave immediately because of the family

24   obligations seems to have put aside the fact that we

25   accelerated this sentence and the production of the presentence

1   report to accommodate the defendant's need to return home as

2   quickly as possible already.  And the stated goal at the time

3   was let's set the date as early as possible so then he can do

4   whatever is required under the sentence and still return by

5   August, not that this would be his last day in this country.

6          And I've thought about it, but I just can't say pay

7   your fine at the door and go, especially given the facts in the

8   presentence report concerning this defendant's assets and the

9   assistance he's provided now; I'm not sure it would be felt.

10  And more important, even if every dollar were your own, we're

11  not talking about a traffic ticket.  This was lying during the

12  course of a federal criminal investigation.  So being able to

13  write a check and walk away would not fulfill the function of

14  deterring others, and it would send the exact wrong message.

15  To impose a fine or a probationary sentence alone would be

16  contrary to the policies and principles that led to the

17  creation of the guidelines in the first place, that people with

18  your advantages were getting probation and others weren't.  And

19  the criminal justice system isn't supposed to favor those with

20  means.

21          And while it's true that he did plead guilty and

22  while it would not be fair to treat this defendant more harshly

23  because it's a high profile investigation, I have come to the

24  conclusion that the offense warrants a period of some

25  incarceration.  That would be consistent with other cases in

1   this courthouse, and I think it's necessary to have the strong

2   deterrent effect.  It's a message that needs to be sent,

3   especially given the fact that you're an attorney.  But I don't

4   think it takes a significant period of time to have a

5   significant impact.

6          For all these reasons then, after considering all the

7   statutory factors, the sentence to be imposed is as follows:

8   It's the judgment of the Court that you, Alex Van der Zwaan,

9   are hereby committed to the custody of the Bureau of Prisons

10  for a term of 30 days.  You're also ordered to pay a fine of

11  $20,000.  You are required to pay $100 special assessment into

12  the court because this is a felony offense.  It's immediately

13  payable to the Clerk of the Court for the U.S. District Court

14  for the District of Columbia.

15         Within 30 days of any change of address you have to

16  notify the Clerk of the Court of the change until such time as

17  the financial obligation is paid in full.  While incarcerated

18  you can make payments on the special assessment through your

19  participation in the inmate financial responsibility program.

20         After you are released you will be subject to two

21  months of supervised release as part of your sentence.  The

22  conditions of that are that you shall report in person to the

23  probation office immediately after you've served your sentence.

24  While on supervision you shall not possess a firearm or other

25  dangerous weapon.  You shall not use or possess an illegal

1     controlled substance, and you shall not commit another federal,

2     state, or local crime.  You have to abide by the general

3     conditions of supervision adopted by the U.S. Probation Office,

4     as well as the following conditions:

5          Pursuant to 42 U.S. Code § 14135a, as for all felony

6     offenses, you have to submit to the collection and use of DNA

7     information, either while incarcerated or at the direction of

8     the U.S. Probation Office.

9          I will relieve you of any drug testing requirements.

10          It is also a condition of your supervised release

11     that you pay the fine in full, at which time you may self-

12     deport, if that is permitted by ICE.  You shall comply with the

13     Bureau of Immigration and Customs Enforcement's immigration

14     process.  If you are deported, you shall not reenter the United

15     States without legal authorization during the period of your

16     supervision.  Should you receive permission to return to the

17     United States while you're still on supervised release, which

18     is unlikely since it's only going to be for two months, you

19     have to report to the U.S. Probation Office in the area where

20     you intend to reside within 72 hours of your return.  But, I

21     would permit you, as a condition of your supervised release, to

22     retain your -- retrieve your passport and leave the country.

23          Now, one thing I have not addressed is voluntary

24     surrender.  I would be, in his case, willing to permit him to

25     voluntarily surrender.  And I can make the necessary findings,

1    but I know that the defense has strongly talked about haste.

2    So I'm willing to hear from both parties, if anybody has a

3    different point of view.

4              MR. SCHWARTZ:  Yes.  Your Honor, can you give me just

5    a moment, please?

6              THE COURT:  Yes.

7              (Off-the-record discussion between defense counsel.)

8              MR. SCHWARTZ:  Your Honor, what we would ask the

9    Court to do is to recommend that he -- that the Bureau of

10   Prisons designate Mr. Van der Zwaan to Allenwood low security,

11   where I understand they may be able to expedite, because what

12   they have in their own facility is deportation.  They may be

13   able to do that internally and not cause him to have additional

14   time in an ICE -- separate ICE facility.

15             THE COURT:  I'm happy to make that recommendation.

16   It's not my understanding that a sentence less than six months,

17   the Bureau of Prisons designates him anywhere, other than the

18   CTF at the D.C. jail.  But, I'm happy to make that

19   recommendation, but I'm not sure that works.

20             MR. SCHWARTZ:  I've been told that they can do that.

21   But may be we're dealing with different sources, and I might be

22   wrong.  It's the first I've heard --

23             THE COURT:  As I said, the Bureau of Prisons makes

24   the designation.  It considers the Court's recommendation, it

25   doesn't feel bound to follow them.

1          MR. SCHWARTZ:  That I know.

2          THE COURT:  So, I'm happy, at your request, to -- I

3     will permit him to voluntarily surrender.  I believe --

4          MR. SCHWARTZ:  We would ask that you make the

5     recommendation that I've requested, that he be permitted to

6     voluntarily surrender, upon designation, to whatever facility

7     he's designated to.

8          THE COURT:  That's what voluntary surrender is doing.

9     And I will do that, that's in the order.  I'm permitting him to

10    voluntarily surrender.  The recommendation would be that it

11    will be at the Allenwood --

12         MR. SCHWARTZ:  Allenwood.

13         THE COURT:  -- facility.

14         MR. SCHWARTZ:  Okay.  And normally -- so, the

15    voluntary surrender, I normally have seen a date certain set,

16    that you must surrender at such and such a time.  We want to be

17    able to surrender immediately upon designation, which I

18    understand the Court can order.

19         THE COURT:  Well, the facility has to be able to

20    receive him.

21         MR. SCHWARTZ:  Yes, we understand that.

22         THE COURT:  And I've actually had situations where

23    people showed up early.  I think you need to surrender at the

24    place and time that they order you to surrender.  And I would

25    recommend that it be done as quickly as possible.

```
1              MR. SCHWARTZ:  Yes.

2              THE COURT:  There's another way to get it done as

3    quickly as possible; I'm sure you're aware of what that is.  I

4    don't think it's necessary in his case.  I don't think he's a

5    flight risk, I don't think he's a danger to the community, and

6    I'm not inclined to step him back.  But, that's how you start

7    today.

8              MR. SCHWARTZ:  We understand that, Your Honor.  We're

9    not asking for that.

10             THE COURT:  Okay.  Mr. Van der Zwaan, you have the

11   right to appeal the sentence imposed by this Court if the

12   period of imprisonment is longer than the statutory minimum or

13   the sentence departed upward from the applicable sentencing

14   guideline range.  If you choose to appeal, you have to file any

15   appeal within 14 days after the Court enters judgment.  If you

16   are unable to afford the cost of an appeal, you can request

17   permission from the Court to file an appeal without cost to

18   you.

19             I'm going to require that the probation office

20   release the presentence investigation report to all appropriate

21   agencies, including the Bureau of Immigration and Customs

22   Enforcement, in order to execute the sentence of the Court.

23             Is there anything --

24             MR. SCHWARTZ:  Your Honor, one more request.

25             THE COURT:  Yes?
```

1          MR. SCHWARTZ:  If Your Honor could expedite as

2     quickly as possible the filing of the judgment, so that we can

3     get everything moving.

4          THE COURT:  I usually do that quite quickly.

5          MR. SCHWARTZ:  Thank you.

6          THE COURT:  Yes?

7          MR. WEISSMANN:  During the interim, between today and

8     the date that the defendant will surrender voluntarily, I

9     assume the bail conditions are the same?

10          THE COURT:  Yes.  I mean, his passport remains in the

11     custody of --

12          MR. WEISSMANN:  The government.

13          THE COURT:  -- the government at this time.  Yes, I

14     don't think he's under any other conditions, other than weekly

15     phone call reporting; so those will remain.

16          MR. WEISSMANN:  And I think there are some travel

17     restrictions, as well.

18          THE COURT:  Well, he can't travel anywhere.

19          MR. SCHWARTZ:  Yeah, he has restrictions already.

20          THE COURT:  All the current conditions will remain in

21     place.

22          Anything further on behalf of the defendant?

23          MR. SCHWARTZ:  Not at this time, Your Honor.

24          THE COURT:  Okay.  Thank you.

25                              *   *   *

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4          I, JANICE DICKMAN, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true and complete transcript of

7    the proceedings to the best of my ability.

8               Dated this 3rd day of April, 2018.

9

10

11                    /s/_____

12                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
13                    Room 6523
                      333 Constitution Avenue NW
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25